No. 12865

IN THE SUPREME COURT OF THE STATE OF MONTANA

1975

JACQUELINE ALLEN et al.,

Plaintiffs and Appellants,

-vs-

WALTER S. MOORE, JR., et al.,

Defendants and Respondents.

Appeal from: District Court of the Sixth Judicial District,
Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

For Appellants:

Hibbs, Sweeney and Colberg, Billings, Montana
Maurice Colberg argued, Billings, Montana

For Respondents:

Moulton, Bellingham, Longo and Mather, Billings,
Montana
William S. Mather argued, Billings, Montana
Small, Cummins and Hatch, Helena, Montana
Robert Cummins argued, Helena, Montana

Submitted: March 6, 1975

Decided: MAY -8 1975

Filed: MAY 8 1975

Thomas J. Kearney
Clerk

Mr. Chief Justice James T. Harrison delivered the Opinion of the Court.

In this cause plaintiffs are the widow, personal representative, and children of Eugene Tyler Allen, deceased, who brought this wrongful death and survival action in the district court, Sweet Grass County. Originally the defendants were Walter S. Moore, Jr., and one Barney L. Hitt, III. A motion for summary judgment for Hitt was granted prior to trial. The jury returned a verdict for defendant Moore and judgment was entered. From this judgment and an order denying a motion for a new trial, plaintiffs appeal.

An automobile accident occurred November 27, 1971, at approximately 9:40 a.m., on Interstate 90 highway about 13 miles west of Big Timber, Montana. The weather conditions existing at the time were: the sky was overcast, it had been snowing, and there was slush on the highway.

The vehicles involved in the collision were: (1) an International Scout vehicle driven by Moore and in which decedent was in the right front seat and one Ed Sills was in the rear seat area on a platform. Sills was asleep at the time of the collision. The Scout was proceeding east. (2) A Chevrolet station wagon, driven by Gerald Cosgriff, his wife Donna in the right front seat, daughter Sarah on her mother's lap, and their sons Edward and David in the rear seats. The Chevrolet was proceeding west.

The roadway where the collision occurred was straight and level, with a broken center line permitting passing; there were two lanes for traffic and the roadway/approximately 22 feet
was
wide. Cosgriff estimated the speed of the Scout at the time he first saw it, as being in excess of 50 mph. Moore estimated his speed prior to the collision at 30 to 35 mph, but in a statement

- 2 -

given on December 20, 1971, he estimated his speed at 40 to 45 mph. The highway patrol officer estimated the speed of the Scout at approximately 35 to 40 mph, based on the extent of the damage to the vehicles.

Prior to the collision Moore passed a vehicle driven by Clarence Russell, also traveling east, approximately one-half to one mile before the collision occurred. Russell saw the collision 150 to 200 yards to his front. Russell testified he was traveling 25 to 30 mph and he thought the Scout could have been going 40 to 45 mph at the time it passed him.

Cosgriff's vehicle was in its lane of traffic and he testified that when he first observed the Scout it seemed to be under control. Then it turned toward the center of the road; the rear slipped to the right a little bit; then the Scout turned again, this time to the right and the rear slipping to the left; then it slipped around again and came back so that the right side was coming towards him, sliding sideways. The/Cosgriff vehicle front of the hit the Scout on its right side. This impact occurred near the edge of the oil in Cosgriff's lane.

Russell testified he saw the accident happen, and it looked like the Scout kind of turned sideways and went across the road and they hit. When they hit the snow flew up, giving the appearance of smoke, and the Scout went on into the borrow pit.

Defendant Moore testified:

"Q. Mr. Moore, isn't it true that you had noted on your trip to Montana that when there was snow on the highway drivers would drive their vehicles in such a manner that their left wheels would be on the center line of the highway and their right wheel into their lane of traffic on two lane highways, so that there were only three beaten traffic zones down the highway. Is that a custom that you noted when you were out here? A. Yes, sir.

"Q. Immediately prior to this accident and when you first saw the other vehicle, isn't it true that you were driving in accordance with that custom with your left wheel on the center line of the highway? A. Yes, sir, I was, or approximately where I considered the center line of the highway.

"Q. And was the Cosgriff vehicle, or the other vehicle, also being driven in that same manner? A. I am not at all positive how he was driving his vehicle.

"Q. You didn't see whether his left wheel was on the center line? A. I saw his vehicle. I am not at all positive that he had his left wheel on the center line or not.

"Q. Now, isn't it true that you felt since your left wheel was on the center line that you had to turn into the right-hand lane of traffic to some degree to be out of a collision course with the Cosgriff vehicle? A. Not necessarily a collision course, but it would come extremely close to an oncoming car, yes, sir, and I did feel that I would have to move over, that is correct.

"Q. So then in fact did you move over? A. Yes, sir, I did.

"Q. And did you then move into the slush? A. I believe we were in the slush the entire time. I did have to move over, yes, sir.

"Q. Now, when you moved over isn't it true that your vehicle veered sharply to the right, the rear portion of your vehicle. A. Yes, sir, it did, it did slip to the right.

"Q. Would you designate then that it veered sharply to the right, is that the way you would describe it? A. Well, I would assume so, yes, sir. I don't know what you call sharply. The back of the vehicle quite quickly shifted to the right.

"Q. And did the front of the vehicle then point toward the center of the highway? A. To the center, yes, sir, it would have had to.

"Q. And the rear of the vehicle moved toward the southerly borrow pit I take it of the highway? A. Yes, sir.

" * * *

"Q. Did the vehicle move in an oblique manner down the highway toward the Cosgriff vehicle? A. At the moment directly after the time that it slipped?

"Q. Yes. Is that what next happened? A. I would say that it slipped going straight for just an undetermined amount of feet.

- 4 -

"Q. Okay. And then after it slipped going straight did it then slip obliquely toward the Cosgriff vehicle? I guess I mean across the highway toward the Cosgriff vehicle? A. Yes, sir, it did.

"Q. Did you hit the brakes? A. Yes, sir, I did.

"Q. And did you keep the brakes locked until the time of impact? A. Yes, sir, I did.

"Q. So the sequence of events then, if I understand you correctly, is this true, you were driving with your left wheel on the center line, is that correct? A. Yes, sir.

"Q. You then moved to the right into the right-hand lane of traffic, is that correct? A. Yes, sir.

"Q. And when you did that the right rear portion of your vehicle slipped to the right putting the front portion toward the center of the highway, is that correct? A. Yes, sir.

"Q. And then you hit the brakes, is that correct? A. Yes, sir.

"Q. And you moved obliquely down the highway and struck the Cosgriff vehicle? A. Yes, sir.

"Q. Did anything else happen between the time you slipped and the time you hit the Cosgriff vehicle? A. Yes, it did.

"Q. What happened? A. At the time that I saw the Cosgriff car I determined that I would have to move to my right. I started to move to my right, at which time the back of the vehicle slipped sharply to the right. At the time that the vehicle slipped Mr. Allen as I said was asleep over on the right-hand side, or semi-asleep. It startled Mr. Allen and he simultaneously with the slipping he grabbed the steering wheel. At the point that he grabbed the steering wheel I completely panicked and slammed on the brakes. At the time that I slammed on the brakes the vehicle slid from that point on completely out of control until it hit the Cosgriff automobile.

"Q. And you claim that Allen grabbed the steering wheel? A. Yes, sir, I do.

"Q. Do you claim he said anything at that time? A. Yes, sir, I do.

"Q. What do you claim he said at that time? A. He said you are going to lose it."

Moore in his answer raised the defense of contributory negligence on the part of the decedent. The quoted testimony is the only evidence of that contributory negligence. Since it was

- 5 -

inconsistent with prior statements, it was used for the purpose

of impeachment.

One statement was given by Moore on December 20, 1971,

and after the statement was read to Moore he acknowledged there

was nothing in the statement about decedent's grabbing or touch-

ing the steering wheel. Moore explained he did not read the

statement before signing and that he was pressed for time.

While the investigating officer talked to Moore at the

accident scene and also at the hospital and heard nothing about

decedent grabbing or touching the steering wheel, it is rather

clear his questioning of Moore was at a time when he was dis-

traught and disturbed and, as the officer stated:

> "As near as I recall he said I lost it in the slush.
> And it was just a general type conversation with
> no real hard interrogation or pushing of facts at
> this time."

Moore talked to decedent's widow eight days after the

accident, and testified:

> "Q. Now isn't it true, Mr. Moore, that at that
> time Mrs. Allen asked you concerning how this
> accident occurred. A. Yes, sir, she did.
>
> "Q. And isn't it true that you told her that you
> lost control of the vehicle in the slush and
> ran into the Cosgriff vehicle? A. Yes, sir, I did."

Moore explained that it was out of feelings for the family that

he made no mention of the fact that decedent had grabbed the

steering wheel.

Moore's deposition was taken by one of plaintiffs'

counsel on January 22, 1974, and therein Moore claimed that the

decedent had grabbed or touched the steering wheel prior to the

impact. On the same day a deposition was taken of Barney L.

Hitt, III, the owner of the Scout, and who at that time was still

a defendant in the case. Hitt stated he had a conversation with

Moore about two weeks after the accident and in relating what

Moore told him, he stated:

"He said that -- he said that just before they
got to Big Timber, that he lost control of the
car for one reason or another and it went into
the -- into the left lane and struck the Cos-
griff vehicle head-on. He said at that time
it swerved and went into the left lane, that he
was trying to regain control of the vehicle when
Gene Allen grabbed the wheel, and that at the
time of the collision, he and Gene were struggling
at the wheel."

Hitt could not recall whether the conversation was at his home
or by phone. Moore claimed the conversation occurred over the
telephone.

Plaintiffs raise these issued on this appeal. Was the
district court in error in:

(1) Permitting the reading of the deposition of Hitt
as a prior consistent statement after impeachment?

(2) Allowing instructions on contributory negligence on
the part of plaintiffs' decedent?

(3) Failing to direct a verdict on the liability issue
at the end of plaintiffs' case?

(4) Refusing a portion of plaintiffs' offered instruc-
tion concerning section 32-2152, R.C.M. 1947?

Issue 1, was it error to admit into evidence the Hitt
deposition?

As we have heretofore related defendant Moore, at the
trial, testified that after the Scout had slipped to the right,
decedent grabbed the steering wheel. Thereafter he was impeached
by the use of his statement of December 20, 1971, which omitted
any reference to decedent grabbing the steering wheel. Other
instances have been referred to previously.

Plaintiffs contend that Kipp v. Silverman, 25 Mont. 296,
302, 64 P. 884, (1901) is decisive in that, in their view, this
Court held that prior consistent statements are not admissible to
rehabilitate an impeached witness where the motive to falsify was

- 7 -

the same at the time of the consistent statement as at the time of trial.

Defendant calls attention to the fact that the statement made by Moore contained in the Hitt deposition was on or about December 12, 1971, two weeks after the accident and eight days before the December 20 statement. Also, before any suit was instituted and before any motive for fabrication existed and corroborates Moore's testimony and therefore would be admissible. Defendant also asserts that Kipp followed a previous suit over the property involved. Before the second suit was commenced Kipp entered into a contract and wrote the letters complained of, and therefore the court thought they were sham and a fabrication.

Kipp did not state that there was in Montana no exception to the hearsay rule but stated:

"To this rule one exception is recognized by the authorities cited. Where it is charged that the story of the witness is a fabrication, owing to an interest acquired in the result of the case subsequent to the time at which the statement in question was made, then the statement may be admitted on the theory that it was disinterested, and therefore probably true."

Both parties have cited excerpts from annotations appearing in 140 A.L.R. 21, and 75 ALR2d 909. These quotations cover a multitude of situations appearing in the cases used as authority. We feel that one statement appearing in 75 ALR2d 918, is particularly fitting here:

"While, as the cases throughout the annotation indicate, it is well recognized that as a general rule the testimony of a witness cannot be bolstered up or supported by showing that he has made statements out of court similar to and in harmony with his testimony on the witness stand, the rule is relaxed or not applied where the witness has been impeached or his credibility assailed.

"The purpose of admitting prior consistent statements is not to prove the principal facts to be established, and indeed, they are not admissible to do so, but only to show that the witness has

- 8 -

been consistent in giving the same narrative of fact, and that his former statements are consistent with his sworn testimony as given at the trial, and thus to some extent remove suspicion that his testimony has been fabricated or colored to meet the emergencies of the case or that his recollection has varied and is therefore not to be relied upon.

"Regardless of the form of impeachment, the trial judge should be and is allowed a reasonable discretion in receiving or rejecting evidence of prior declarations of a witness consistent with his testimony, and the appellate court is loath to disregard an exercise of such discretion except in a clear case of abuse."

From the total review of the law and the evidence, we do not believe the trial judge abused his discretion in permitting the admission of the Hitt deposition in evidence.

Issue 2, concerns the giving of the contributory negligence instruction by the court.

While plaintiffs contend that even if defendant Moore's version of the accident as testified at the trial is believed, the decedent would have been, as a matter of law, in a sudden position of peril not brought about by his own negligence which required instant action to avoid a threatened danger. His activities in attempting to straighten the wheel, although on hindsight not the best or safest way to save his life, were still the acts of an ordinary prudent person under similar circumstances. Moore testified:

"At the time that I saw the Cosgriff car I determined that I would have to move to my right. I started to move to my right, at which time the back of the vehicle slipped sharply to the right. At the time that the vehicle slipped Mr. Allen as I said was * * * asleep. It startled Mr. Allen, and he simultaneously with the slipping grabbed the steering wheel. At the point that he grabbed the steering wheel, I completely panicked and slammed on the brakes. At the time that I slammed on the brakes, the vehicle slid from that point on completely out of control until it hit the Cosgriff automobile."

A reasonable interpretation of this testimony would be

- 9 -

that Moore did not feel the Scout was out of control and that but for the fact decedent grabbed the wheel he would not have had the accident. The testimony of Moore is sufficient to support the giving of the standard contributory negligence instruction.

This Court has said innumerable times that one witness may be sufficient to establish preponderance of a case, and even if that evidence is inherently weak, it can still be deemed substantial. Campeau v. Lewis, 144 Mont. 543, 398 P.2d 960, (1965).

Issue 3 questions the denial of plaintiffs' motion for a directed verdict on liability. This motion was grounded on the theory that Moore had been shown to be negligent as a matter of law at the time he claimed decedent grabbed the steering wheel, and decedent could not have been contributorily negligent based upon the theory of sudden emergency.

We cannot accept this premise in view of our holding as to the giving of the contributory negligence instruction. We find no error in the denial of the motion.

Issue 4 concerns the refusing of a portion of plaintiffs' offered instruction concerning section 32-2152, R.C.M. 1947.

Section 32-2152, R.C.M. 1947, reads:

"Drivers of vehicles proceeding in opposite directions shall pass each other to the right, and upon roadways having width for not more than one (1) line of traffic in each direction each driver shall give to the other at least one-half (1/2) of the main-traveled portion of the roadway as nearly as possible."

While plaintiffs contend there was ample testimony to justify the inclusion of this statute in the offered instruction, defendant asserts it would not have any application to the facts of this accident. It appears to us that there was no evidence the accident occurred while the vehicles were passing and the trial court committed no error in refusing this

- 10 -

portion of the instruction which was not warranted by the facts.

The judgment is affirmed.

_____
Chief Justice

We concur:

_____

_____

_____
Justices

_____
Honorable Alfred B. Coate,
District Judge, sitting in place
of Mr. Justice Frank I. Haswell.

- 11 -